[Cite as *Smith v. Smith*, 2018-Ohio-1531.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| HERBERT E. SMITH | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 27849 |
| | : | |
| v. | : | Trial Court Case No. 03-DM-166 |
| | : | |
| BRENDA L. SMITH, NKA MOORE | : | (Domestic Relations Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 20th day of April, 2018.

. . . . . . . . . . .

MATTHEW J. BARBATO, Atty. Reg. No. 0076058, 2625 Commons Boulevard, Suite A, Beavercreek, Ohio 45431
     Attorney for Plaintiff-Appellant

J. DAVID TURNER, Atty. Reg. No. 0017456, P.O. Box 291771, 101 Southmoor Circle NW, Kettering, Ohio 45429
     Attorney for Defendant-Appellee

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Herbert Smith appeals from a judgment of the Montgomery County Court of Common Pleas, Domestic Relations Division, which terminated his shared parenting agreement with Brenda Moore and designated Moore as the child's legal and custodial parent.

{¶ 2} For the following reasons, the judgment of the trial court will be affirmed.

***Background and Procedural History***

{¶ 3} The parties were granted a final decree of dissolution of marriage in May 2003. There was one child of the marriage, a son, L.S., who was not yet one year old at the time of the dissolution. The decree of dissolution incorporated a shared parenting plan to which the parties had agreed, and which provided for parenting time on alternating weeks until L.S. reached school age. At that time, if the parties lived in close proximity, they expressed their intention to continue parenting time in alternating weeks, with Smith as the residential parent for school purposes. If such an arrangement proved unworkable, L.S. would live primarily with Smith, and Moore would have parenting time in accordance with the standard order and at such other times as the parties may agree.

{¶ 4} In the intervening years, the parties filed various motions for contempt or for modifications of the parenting arrangements, which were resolved by agreement, by withdrawal of the motions, or by decision of the trial court. Shared parenting continued, but Moore's parenting time was eventually governed by the standard order rather than the alternating week schedule.

{¶ 5} On March 15, 2017, Moore filed a motion to terminate shared parenting and to be designated as the legal and custodial parent. L.S. was then almost 15 years

old. A magistrate ordered a family investigation by a social worker and conducted a hearing on June 19 and August 22, 2017. The family investigation report was considered, without objection, as a court's exhibit. On September 8, 2017, the magistrate filed a decision which found that it was in L.S.'s best interest to terminate shared parenting and name Moore as "custodian and residential parent." Smith was ordered to pay child support and to submit to a mental health assessment.

{¶ 6} Smith filed objections to the magistrate's decision. On December 26, 2017, the trial court filed a Decision and Judgment which overruled Smith's objections and incorporated the magistrate's decision with respect to the termination of shared parenting, the designation of Moore as the legal and custodial parent, the payment of child support, and Smith's submission to a mental health assessment.

{¶ 7} Smith appeals, raising one assignment of error. He contends that the trial court abused its discretion when it found that the termination of shared parenting was in L.S.'s best interest.

### Termination of Shared Parenting

{¶ 8} R.C. 3109.04(E)(2)(c) permits a court to terminate shared parenting at the request of one or both parents if the court determines that shared parenting is not in the best interest of the child. After terminating a shared parenting agreement, the court must then issue a modified decree allocating parental rights "as if no decree for shared parenting had been granted and as if no request for shared parenting ever had been made." R.C. 3109.04(E)(2)(d). *See also Blessing v. Blessing*, 2d Dist. Montgomery No. 27353, 2017-Ohio-2878, ¶ 17.

{¶ 9} Pursuant to R.C. 3109.04(F)(1), the trial court must consider all relevant

factors in determining the best interest of a child with respect to custody and visitation, including, but not limited to: the wishes of the child's parents; the wishes and concerns of the child, if appropriate; the child's interaction and interrelationship with his or her parents, siblings, and any other person who may significantly affect the child's best interest; the child's adjustment to home, school, and community; the mental and physical health of all persons involved in the situation; the parent more likely to honor and facilitate parenting time or visitation and companionship rights; whether either parent has failed to make all required child support payments; whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent has denied the other parent's right to parenting time in accordance with an order of the court; and whether either parent has established a residence, or is planning to establish a residence, outside this state. *See also Portis-Phillips v. Phillips*, 2d Dist. Clark No. 2016-CA-34, 2016-Ohio-7803, ¶ 19.

{¶ 10} Additionally, in determining whether shared parenting is the best interest of a child, the court shall consider: the ability of the parents to cooperate and make decisions jointly with respect to the children; the ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent; any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent; the geographic proximity of the parents to each other and the practical considerations related to shared parenting; and the recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.   R.C. 3109.04(F)(2).

{¶ 11}   "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the

court's determination will have on the lives of the parties concerned."  *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988).   Under the abuse-of-discretion standard in a custody case, "disputes about the facts, the weight accorded the testimony, and the credibility of witnesses are left to the trial court."  *Gartin v. Gartin*, 2d Dist. Clark No. 2011-CA-74, 2012-Ohio-2232, ¶ 7, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).   "The question is whether evidence was presented that, if believed, supports the trial court's findings."  *Id*., citing *Ross v. Ross*, 64 Ohio St.2d 203, 204, 414 N.E.2d 426 (1980).   An abuse of discretion occurs when the trial court's decision is unreasonable, arbitrary, or unconscionable.   *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 12}  Moore testified at the hearing that, for ten years, she had had no communication with L.S. by phone while L.S. was at his father's house, because Smith did not allow it, notwithstanding that Moore had provided L.S. with a cell phone for this purpose.   Moore did allow L.S. to communicate with his father by cell phone while at her house.   Moore also testified that Smith never told her anything about school activities, medical care, or other issues related to L.S.; she got all of her information from L.S. during his visits.   Moore did not know whether Smith had an email address and had not attempted to call him in many years, because "he doesn't want to hear from me" and "I already know that I'm not going to get any information from him."

{¶ 13}  Moore testified that L.S. had a girlfriend of 11 months at the time of the hearing and that she and her husband have included the girlfriend in some of their activities when L.S. is with them.   One of these activities included a family sleepover at Christmas, which is a family tradition.   Moore has also spent some time with the girlfriend

when L.S. is not with them, working on a project that was a gift for L.S. Moore is remarried; she testified that L.S. gets along well with his stepfather and that they play basketball, toss football, and fish together.

{¶ 14} Moore expressed concern that Smith "sheltered" L.S. and did not allow him to do things that a "normal 15-year-old" would be allowed to so, such as spending time with friends, playing sports, being involved in other activities, acting independently, and having contact with people other than his father. Moore believed that Smith's restrictive behavior was bothering L.S. more as he got older. She stated that, in her view, the social worker's assessment that Smith had a somewhat unhealthy relationship with L.S. was consistent with her own perceptions.

{¶ 15} Moore recounted that that L.S. had played football in eighth grade and had asked to play again in ninth grade. Moore signed him up during a week that he was with her over the summer, and she drove him to practice each day. However, when L.S. returned to Smith's house, Smith refused to allow him to play and withdrew him from the team.

{¶ 16} Moore stated that she would "absolutely" facilitate parenting time with Smith if she were the custodial parent. But she also wanted L.S. to be able to do things he enjoys, such as playing sports and spending time with friends, and to have contact with people other than his father. She believed L.S. was being "sheltered" and that he was "at a plateau" beyond which he would not progress if Smith continued to limit his contacts and activities.

{¶ 17} Smith testified that he "preferred [L.S.] to be with me [Smith] at all times," that he did not think Moore would keep L.S. "on top of" or excelling in his school work if

he lived with her, and that he disapproved of Moore's letting L.S.'s girlfriend sleep over at her (Moore's) house. Smith acknowledged that he is "very overprotective" of L.S., does not encourage L.S. to leave their property, and is afraid of L.S.'s being taken by a stranger. Smith stated that he had not wanted L.S. to play football in ninth grade because of the risk of injury, and that L.S. also did not want to play. However, Smith also denied that his safety concerns were the reason L.S. did not play football. According to Smith, L.S. had expressed an interest in basketball, and Smith did not know why L.S. had not played basketball.

{¶ 18} Smith told the family investigator that he believed Moore did not deserve time with L.S., and he acknowledged that he did not permit L.S. to communicate with Moore by phone at his house, even using the cell phone that Moore had provided. Smith testified that L.S. had not shown any interest in speaking to his mother by phone until six to eight months before the hearing. He also testified that he would prefer for L.S. to attend school in the summer than to spend extended time with Moore, because "[y]ou can't get too educated." Smith acknowledged that he has spoken negatively about Moore in front of L.S., and that L.S. becomes "very upset" when they have conversations about "skin color."[1]

{¶ 19} Smith testified to his belief that L.S. and his girlfriend were "probably sleeping together"; he did not cite any bases for this belief except that "14-year-olds have hormones going crazy," his suspicion and disapproval about the girlfriend's sleepover at Moore's house, and a comment from the girlfriend that L.S. snores. Smith could recall only one occasion when L.S. had friends at their house and one occasion when the

---

[1] L.S.'s stepfather is of a different race.

girlfriend had been at their house. Smith expressed concerns about the girlfriend's family and about allowing L.S. and his girlfriend to spend a lot of time together. L.S. had not ever been allowed to go to friends' houses, but he was allowed to go to the houses of cousins and uncles.

{¶ 20} Smith's testimony repeatedly alluded to an incident many years earlier where L.S. was allegedly "found at Children's Medical with drugs and alcohol on him," to which Moore's attorney objected because of its timing long before the hearing and the fact that it had "already been litigated"; the details of the incident were not developed at the hearing and the magistrate stated, "I'll give it the weight to which it's entitled."

{¶ 21} The Family Investigation Report was prepared by Tonya Charles, LSW, who interviewed Moore, Smith, and L.S., and Moore's husband, Michael.

{¶ 22} Based on her conversation with Moore, Charles stated that Moore believes Smith does not sign L.S. up for activities, because he does not want Moore and her husband to attend; they had attended every game when L.S. played football. Smith had allegedly made comments to L.S., which L.S. reported to Charles, about Smith's embarrassment that Michael Moore was black and that "he [Smith] didn't move all of these counties away for [Moore] to be hanging out in Lakeview [the town where Smith lived]."

{¶ 23} Moore also reported to Charles that she wanted L.S. to be happy, have friends, experience things, and be able to do things with his girlfriend. She recounted that the girlfriend's family had invited L.S. to attend fireworks, but Smith had not allowed him to go for fear that L.S. would be kidnapped and the girlfriend's family "wouldn't even care." Moore described Smith as "overprotective to crazy." She recounted that L.S. is not allowed outside the house without supervision, such as to ride his bike, and when

father is outside mowing the grass, L.S. is required to sit outside with him. Mother also believed, from conversations with L.S., that Smith was pressuring L.S. to tell Smith what L.S. was planning to say to Charles. Mother reported a close bond between L.S. and her husband, Michael, such that L.S. confided in Michael about his frustrations with Smith.

{¶ 24} In Charles's conversation with Smith, Smith confirmed that there was no communication between him (Smith) and Moore; Smith also expressed his opinion that "she's never done anything and doesn't deserve the time with [L.S.]." Smith testified that, ideally, he wanted Moore to have no parenting time. While Smith acknowledged that he did not need to be so protective of L.S., he said he did not have any mental health concerns for himself or L.S. and saw no need for counseling. Smith mentioned that Moore has an older son who had allegedly been arrested "for drugs," and that Moore had "zero" parenting skills.

{¶ 25} L.S. told Charles that he was a good student and had many friends. He described Moore as "caring" and "there is nothing really bad about her." He described Smith as pushing him [L.S.] to do his best, but expressed a desire for Smith to be more tolerant and to get angry less quickly. L.S. expressed the warmest feelings for Michael Moore, his stepfather, whom he described as "super caring," adventurous, and a good leader with "an extra funny bone."

{¶ 26} In describing how and whether they talk about Smith at Moore's house, L.S. denied that they talk about him, except that Michael sometimes says that they are praying for Smith. On the other hand, L.S. described Smith's comments about Moore as "unfiltered, uncut," and that he never says anything nice about Moore or her husband; Smith had also told L.S. that if he moved to Moore's home, he had "no chance of attending

college in the future." L.S. stated that he "can't debate" with Smith because, when talking "about skin color and stuff," Smith gets very angry; this was one of the most frequent topics of their arguments. L.S. described Smith as a "hermit."

{¶ 27} L.S. expressed that there would be "much, much less stress" in his life if he went to live with Moore, but that he was also "okay with things remaining the way they are." He stated that it would be "bittersweet" to move to a new school, but that he would have no problem making new friends.

{¶ 28} Michael Moore told Charles that L.S. first came to him about the idea of changing the custody arrangement. Michael believed that L.S.'s mind and "horizons" need to be broadened so that he could continue to grow, experience things, and learn life skills. Michael described L.S. as an extrovert who wants to experience everything. Michael believed that Smith was not preparing L.S. to live independently or to trust anyone.

{¶ 29} Both parties reported that L.S. does very well in school and is a great young man. It was also undisputed that Smith had been found in contempt a few years earlier for interfering with Moore's parenting time.

{¶ 30} Charles's report described shared parenting in this family as "unsuccessful." Although she observed a loving relationship between Smith and L.S. and credited Smith with being involved in and supportive of L.S.'s education, Charles concluded that Smith "seems to impede [L.S.'s] personal development" by denying him opportunities for activities and socialization. Charles also reported that Smith does not foster the relationship between L.S. and Moore, other than complying with her parenting time, and he speaks very critically of Moore and her husband despite L.S.'s love and

respect for them. "Father seems to harbor a disdain for [Moore] and an almost obsessive relationship with [L.S.]." On the other hand, Moore "maintained a seemingly respectful and non-judgmental approach" to Smith, which L.S. confirmed.

{¶ 31} Charles recommended that shared parenting be terminated and that Moore be named the legal and custodial parent, with L.S. to have alternating weekend parenting time with Smith during the school year and alternating full-week parenting time with Smith in the summer. Charles further recommended that L.S. be allowed telephone and electronic communication with both parents as requested, and that Moore and Smith communicate directly and unemotionally via email, before and after parenting time, rather than using L.S. as an intermediary. Charles also recommended that the parties not discuss court proceedings or other adult matters with L.S. and refrain from derogatory or disrespectful comments about the other parent(s). Finally, Charles recommended that Smith submit to a diagnostic assessment to determine if he had mental health needs that could be addressed through counseling.

{¶ 32} The magistrate fully incorporated the findings and recommendations of the family investigation report; it also implemented orders with respect to child support that reflected the new parenting arrangement.

{¶ 33} Smith objected to the magitrate's decision, arguing that the shared parenting plan that had been in effect since 2003 had "helped the parties raise an outstanding young man" who was a good student and child. Smith suggested that L.S.'s preference as to parenting might have been swayed by Moore's willingness to "allow him more access to his girlfriend, including overnights with her during parenting time." Smith apparently believed that L.S.'s opinion about parenting time should be discounted on that

basis. He also argued that a parenting arrangement should not be "completely rearranged" when it had been "so successful."

{¶ 34} In overruling Smith's objections, terminating the shared parenting plan, and adopting the parenting arrangement recommended by the magistrate and family investigator, the trial court observed that L.S. "is an outstanding young man. However, [L.S.] is not outstanding because of the parties' successful co-parenting. [L.S.] has become the impressive young adult he is in spite of his parents' total disregard of the promises and commitments made by both of them in the shared parenting plan." The court quoted the shared parenting plan extensively and noted that, despite the parties' strong feelings at one point about working together to raise L.S., that commitment had lasted only a very short time.

{¶ 35} The court noted the parties' lack of communication on matters ranging from names of doctors to important school events. The court also noted Smith's belief that Moore does not "deserve" time with L.S. and seeming disdain for her, as reported by Charles, the family investigator. The court found that L.S.'s desire to live with Moore and his belief that he would have "much, much less stress" living with his mother were entitled to significant weight, and that, of the two parents, Moore was more likely to facilitate parenting time and to foster a positive relationship with Smith. Thus, like the magistrate, the trial court concluded that termination of shared parenting was in L.S.'s best interest and that Moore should be named the legal and custodial parent; Smith was awarded parenting time as discussed above.

*Analysis*

{¶ 36} The court thoroughly considered the nature and intent of the parties'

original shared parenting agreement and the factors set forth in R.C. 3109.04(E) and (F). It reasonably concluded, based on the evidence presented, that it was in L.S.'s best interest to terminate shared parenting. The court found that, for many years, there had been nothing "shared" about the parties' parenting arrangement and that, as a result, Moore's involvement in L.S.'s life had been unnecessarily limited. And although Moore refrained from overt criticism of Smith and hostility toward him in front of L.S., she did not make any effort to communicate with Smith.

{¶ 37} The trial court also did not abuse its discretion in concluding that L.S.'s best interest was served by naming Moore the legal and custodial parent. This was L.S.'s preference, and the magistrate noted that he had "reasonably articulated his reasons for wanting the switch while acknowledging the impact it would have on him and [Smith]." As a teenager, L.S. was old enough that his preference was entitled to significant weight; the trial court's conclusion that L.S. was "an outstanding young man" despite the parties' failure to engage in shared parenting was amply supported by the record.

{¶ 38} The trial court could have reasonably concluded that Smith shielded L.S. from the world, friendships, and new experiences in ways that undercut his independence and were at odds with becoming a successful and well-functioning adult. While Smith's fears and parenting choices may not have been harmful to L.S. as a young child, the trial court could have reasonably concluded that they were at odds with the growth and independence one expects during the teenage years. Smith's fears for L.S. and his assumptions about the negative influences of L.S.'s girlfriend and friends find no support in the record and convey a distrust of L.S. that, on this record, was unfounded. The trial

court did not abuse its discretion in concluding that Moore's parenting style was in L.S.'s best interest at this stage of his life. L.S.'s good relationship with Michael Moore provided an additional benefit to this arrangement. Moreover, based on past behaviors, the court reasonably concluded that Moore was more likely to facilitate and be accommodating of Smith's involvement in L.S.'s life than Smith had been of Moore.

**{¶ 39}** Smith's assignment of error is overruled.

**{¶ 40}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, P. J. and HALL, J., concur.

Copies mailed to:

Matthew J. Barbato
J. David Turner
Hon. Timothy D. Wood